708 So.2d 813 (1998)
STATE of Louisiana
v.
Corey MAJOR and Link L. Jacques.
No. 96-KA-1214.
Court of Appeal of Louisiana, Fourth Circuit.
March 4, 1998.
*815 Harry F. Connick, District Attorney, Val M. Solino, Charles E.F. Heuer, Assistant District Attorneys, New Orleans, for Appellee.
Laura M. Pavy, Louisiana Appellate Project, New Orleans, for Appellant Corey Major.
Robert E. Taylor, Baton Rouge, Anselm N. Nwokorie, Dele A. Adebamiji & Associates, Baton Rouge, for Appellant Link L. Jacques.
Before SCHOTT, C.J., and LOBRANO and WALTZER, JJ.
LOBRANO, Judge.
The appellants, Link Jacques and Corey Major, and co-defendant, James Riley, were charged by grand jury indictment with first degree murder, a violation of La. R.S. 14:30. A jury found Riley not guilty, but found Jacques and Major guilty of manslaughter, a violation of La. R.S. 14:31. The appellants were each sentenced to thirty years at hard labor. Counsel objected to the sentences as excessive and claimed that the trial judge failed to adhere to the relevant sentencing articles.

STATEMENT OF THE FACTS
At approximately 4:30 a.m. on January 16, 1994, Corey Major and Link Jacques, who were standing with a third person, were involved in an argument with Reynold Mercadel in the parking lot of Club Rumors on St. Claude Avenue. About that time, Jeffrey Sanders, Tavis Beall, Kendric Sampson, Derrick Harris and Lemoine Howard, were leaving the club in Sanders's Oldsmobile Cutlass. As they passed Major and Jacques, words were passed between Sampson and the others, at which time Sanders told Sampson to get in the vehicle so they could leave. Sanders made a right turn out of the parking lot and then a U-turn on St. Claude Avenue. Major and Jacques, in a white Nissan Altima with a missing right hubcap, came out of the lot immediately after them. Greg Holmes *816 and his passenger, William Culliver, in a green Isuzu Rodeo, followed several car lengths back.
As Sanders approached the U-turn, the white Altima closely followed around the right side of his vehicle. Shots were then fired from the Altima into the Cutlass. Sanders received a fatal gunshot wound to the head. The Cutlass then ran onto the neutral ground and was stopped by a utility pole. Witnesses ran back toward the club to notify the police officers there. A call was dispatched to stop a white Altima with a missing hubcap. Within a few minutes of the shooting, Officer Nathan McGhee spotted the defendants' vehicle in the 2700 block of St. Claude. After a brief chase, during which Officer McGhee observed someone throw a rifle out of the vehicle, the defendants were apprehended.
In the meantime, Greg Holmes gave the passengers in the Cutlass a ride to the hospital to check on the condition of their friend. Then, at the request of the police, he transported them back to where the defendants were stopped. All of the witnesses then separately identified the defendants, who were seated in separate police vehicles, as the perpetrators. The witnesses also advised the police that there was a third person in the back seat of the vehicle when the shooting occurred. Co-defendant James Riley's name was "developed from the neighborhood" from witness descriptions, but only one witness was able to identify him as the third perpetrator.
Another witness, Gary Jones, was walking home from the club with a friend when he heard the shots. He testified that he saw the guns fire from the Altima and heard two different type sounds, indicating more than one weapon.
The police recovered the abandoned SKS rifle loaded with a magazine which contained one live shell inside and was ready to fire. The rifle had a broken clip. Near the rifle they further found three live cartridges. In addition, the police recovered two live rounds on the passenger seat of the Altima, and one.357 magnum spent shell between the front seats. Several weeks after the incident, when the vehicle was about to be released from the auto pound, another spent bullet was discovered lodged between the rear window and the backboard of the vehicle. No bullet was recovered from the body.
The weapons, bullets and shells recovered had insufficient fingerprints to use for identification purposes. The live shells found on the passenger seat and near the rifle were 7.62 × 39 millimeter, which is consistent with the ammunition used in an SKS rifle. The spent shell found near the rear window was also a 7.62 × 39 millimeter. Comparisons were done of this shell with a shell fired from the recovered rifle, but the results were inconclusive. The spent .357 magnum shell would necessarily have been fired from a handgun, not a rifle.
The defense presented an expert ballistics witness who testified that, from the size of the entrance and exit wounds, it was impossible for the victim to have been killed by a bullet from the abandoned SKS rifle. The State contested the findings of the defense expert in closing argument only, not in rebuttal with another expert.
Gregory McGee testified that he was the third person who was talking to defendants Corey Major and Link Jacques in the parking lot at Club Rumors, but that he never got into the Altima with them. He further testified that he did not see the rifle in the Altima.
Defendant Link Jacques took the stand and admitted that he and defendant Corey Major were at Club Rumors that evening, that they were involved in an argument in the parking lot, that they left in a white Altima, and that they threw the rifle out of the vehicle during the chase with the police. He explained that the Altima belonged to a friend of Major. He testified that the rifle was on the floor of the vehicle when he got in, and that he and Major were trying to sell it. However, he denied that any shots were fired from the Altima. Rather, he testified that the Altima actually left the parking lot first, then the Cutlass, then the Rodeo. He testified that the shots were fired from the Rodeo at the Altima, but hit the Cutlass. He further testified that he and Major were the *817 only ones in the Altima when the incident occurred.

COREY MAJORBRADY CLAIM
Appellant Major avers that the trial court erred in failing to grant a mistrial based on the State's withholding of Brady information. "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-1197, 10 L.Ed.2d 215 (1963). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). Evidence that the government failed to disclose to the defendant is considered collectively, not itemby-item, in determining whether the "materiality" requirement of a Brady violation has been satisfied. Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); State v. Marshall, 94-0461 (La.9/5/95), 660 So.2d 819.
The appellant complains of three Brady violations. The first claim is that the State withheld statements from two witnesses who saw a man about 6'1" with gold teeth involved in the shooting. Defense trial counsel moved to quash on this ground at the beginning of the second day of testimony. Those statements are not in the record. The portion of the police report which is in the record indicates that Corey Major is 5'9", Link Jacques is 6'3", and the unknown third person was estimated at 5'9". Neither trial counsel nor appellate counsel suggests that the 6'1" person was a particular description of Corey Major. Considering that Major and Jacques were apprehended shortly after the incident, the descriptions were likely taken for the unknown third person. In addition, defense witness Gregory McGee, who testified that he was standing with Major and Jacques before they left the parking lot, estimated his height at 5'11". Thus, even had the defense been informed of the description prior to trial, the jury would undoubtedly still have reasoned that the description was for either the unknown third person or Link Jacques, who was apparently very tall.
The second piece of alleged Brady evidence which was withheld from the defense was the spent shell which was located by the auto pound personnel over one month after the incident. The shell was a caliber consistent with the rifle which one of the defendants admitted abandoning during the police chase. The test and comparison performed by the State was inconclusive in determining whether or not that shell was fired from the defendants' rifle. Had a defense expert conducted a test and found that the shell was fired from the subject rifle, it would have been inculpatory. Even had the defense expert found that the shell was not fired from the subject weapon, it would have been just another spent shell, like the one found between the front seats. There is no reasonable probability that this finding would have affected the verdict.
The third alleged Brady evidence which was withheld was prosecution witness Reynold Mercadel's conviction for possession of a firearm, despite defense requests for rap sheets on all State witnesses. This conviction was revealed during Mercadel's crossexamination. Appellant argues that, had he known of this conviction prior to trial, he could have used it in his opening argument and voir dire and impeached Mercadel's credibility to the extent that it would have been determinative of guilt or innocence. This claim is completely without merit. The defense theory, before and after Mercadel's conviction was discovered, was that the occupants of the Rodeo, Greg Holmes and William Culliver, were the shooters. The defense made much of the fact that Greg Holmes, who had no prior convictions but was in jail on a pending charge, appeared in prison garb and chains. After Mercadel's conviction was revealed during cross-examination, the defendants had the opportunity to use it for impeachment.
Finally, trial counsel for Link Jacques deferred his opening statement until after the *818 State put on its case. Counsel for Jacques thus had knowledge of the conviction prior to his opening statement but failed to do anything with it, as Mercadel was only one of six prosecution eyewitnesses, who all testified that the gunfire came from the Altima. Impeachment of Mercadel's testimony with his conviction did not affect the verdict. There is no reasonable probability that knowledge of this conviction by appellant Major or his counsel prior to trial would have changed that result.
Considering these items collectively, there is no reasonable probability that the verdict was affected by the failure of the State to provide the alleged Brady evidence prior to trial. This assignment is without merit.

COREY MAJORSUFFICIENCY OF THE EVIDENCE
Appellant Major, pro se, argues that the evidence was insufficient to support the conviction. The standard for reviewing a claim of insufficient evidence is whether, after reviewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime were proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La.1987).
Specifically, the appellant notes that "only one of the witnesses claimed to have seen a gun come out the window of the front passenger seat where defendant (Major) was sitting, while several other witnesses concurred in their testimony that the gunshots were fired from the rear driver's seat." The appellant further avers that there was no evidence that he acted in any "sudden passion" or "heat of blood."
As to the first claim, La. R.S. 14:24 provides that all persons concerned in the commission of a crime, "whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." Besides the single witness who alleged to have seen a gun come out of the passenger side, which would indicate that Major was a shooter, several witnesses testified that Major was involved in the dispute at the parking lot, and defendant Jacques testified that Major picked him up in the vehicle and the rifle was already in it. The evidence was sufficient for a reasonable jury to find that Major was a principal to the crime.
As to the second element of the claim, La. R.S. 14:31 defines manslaughter as:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or
(2) A homicide committed, without any intent to cause death or great bodily harm.
(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person ....
As to subparagraph (1), "sudden passion" and "heat of blood" are not elements of the offense of manslaughter; rather, they are mitigating factors, in the nature of a defense, which diminish the degree of culpability and reduce the grade of the offense from murder to manslaughter. State v. Brumfield, 93-2404 (La.App. 4 Cir. 6/15/94), 639 So.2d 312. Considering the testimony relative to the argument in the parking lot immediately prior to the shooting, a jury could reasonably have determined that the appellant acted in "heat of blood." In any event, where the defendants shot at the victim's vehicle, they can be presumed to have intended to kill one or more occupants of the vehicle. It is not the State's burden to prove the mitigating factors.
The defendants could also have been found guilty of manslaughter under subparagraph (2) for a homicide committed during the commission of aggravated assault, *819 an intentional misdemeanor against the person.
The evidence is sufficient to support a finding of manslaughter in either case. This assignment is without merit.

BOTH DEFENDANTSSENTENCING
Appellants aver that their sentences are excessive and that the trial court failed to give sufficient reasons for the sentence. Appellant Jacques further avers that counsel was ineffective for failure to file a motion to reconsider the sentence.
As to the last claim, because counsel made an oral objection at the sentencing, the claim of excessiveness was preserved for appeal. State v. Caldwell, 620 So.2d 859 (La. 1993); State v. Davis, 93-0663 (La.App. 4 Cir. 2/25/94), 633 So.2d 822, writ denied, 94-2077 (La.9/20/96), 679 So.2d 422. Thus, counsel was not ineffective.
Article I, Section 20 of the Louisiana Constitution of 1974 provides that "[n]o law shall subject any person ... to cruel, excessive or unusual punishment." The imposition of a sentence, although within the statutory limit, may still violate this provision and may be reviewed on appeal. State v. Caston, 477 So.2d 868 (La.App. 4th Cir.1985).
Generally, a reviewing court must determine whether the trial judge adequately complied with the guidelines set forth in La.C.Cr.P. art. 894.1 and whether the sentence is warranted in light of the particular circumstances of the case. State v. Soco, 441 So.2d 719 (La.1983); State v. Quebedeaux, 424 So.2d 1009 (La.1982). If adequate compliance with Article 894.1 is found, the reviewing court must determine whether the sentence imposed is too severe in light of the particular defendant and the circumstances of the case, keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense charged. State v. Guajardo, 428 So.2d 468 (La.1983). The articulation of the factual basis for a sentence is the goal of Art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, resentencing is unnecessary even when there has not been full compliance with Art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982). The reviewing court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La. C.Cr.P. art. 881.4(D). The sentencing court is given wide discretion in imposing a sentence within the statutory limits, and such a sentence should not be set aside as excessive in the absence of a manifest abuse of discretion by the sentencing court. State v. Square, 433 So.2d 104 (La.1983).
The maximum sentence for the convicted offense is forty years at hard labor. The appellants were each sentenced to thirty years at hard labor. The trial judge noted that the law did not permit him to sentence the defendants without parole, but went on record as opposing any form of early release.
Both defense attorneys advised the trial judge that the defendants were first offenders. In answer to trial counsel's objection to the sentences, the judge noted that the legislature had increased the maximum penalty to forty years, and this maximum applied to first offenders if the nature of the offense supported it. The judge permitted a petition to be filed on behalf of each of the defendants and, in addition, heard testimony from defendant Jacques and his father. The judge then based the defendants' sentences on the egregiousness of the offense and the fact that a lesser sentence would deprecate the seriousness of the offense.
In describing the offense, the judge noted that the original dispute began over a parking place. The judge further noted that it was not a typical crime of passion. Rather, the perpetrators were riding around with a submachine gun in their vehicle at 4:00 in the morning. The judge then discussed the terrible danger the defendants posed to the community by firing such a weapon, with no regard for their intended victim or innocent bystanders. The appellants complained that the sentencing judge's stated reasons were personal and inappropriate for consideration in sentencing. To the contrary, the judge's familiarity with the area and his personal references indicated a concern, not only for his own personal safety and that of his family, but also for the safety of the general *820 community. We find consideration of this factor appropriate in sentencing.
Considering the above, we find that the trial court adequately complied with Art. 894.1, and the sentences imposed were not excessive under the facts of the case.
For the reasons stated above, we affirm the defendants' convictions and the sentences.
AFFIRMED.